IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

_____
                                )
UNITED STATES OF AMERICA,        )
                                )
        Plaintiff,               )
                                )
        vs.                      )  Case No. 2:21-cr-00229-DS-1
                                )
CHAD LEON SAYERS,                )
                                )
        Defendant.               )
_____)


SENTENCING

BEFORE THE HONORABLE DAVID SAM


JULY 15, 2024

10:44 a.m. to 11:52 a.m.


Reported by: Michelle B. Gonsalves, RPR, CRR, CBC, CSR
Orrin G. Hatch United States Courthouse
351 South West Temple, Room 7.431, Salt Lake City, Utah 84101
801.783.8657  michelle_gonsalves@utd.uscourts.gov

**<u>APPEARANCES</u>**

**FOR THE PLAINTIFF:**

        Ruth J. Hackford-Peer, Esq.
        Sachiko Jepson, Esq.
        Jacob Strain, Esq
        US ATTORNEY'S OFFICE
        111 South Main STreet, Suite 1800
        Salt Lake City, Utah 84111-2176
        (801)325-3265
        (801)325-1435
        (801)325-3285
        rhackford-peer@jdrslaw.com
        sachiko.jepson@usdoj.gov
        jacob.strain@usdoj.gov

**FOR THE DEFENDANT:**

        Wendy M. Lewis, Esq.
        Kathryn Neal Nester, Esq.
        NESTER LEWIS PLLC
        40 South 600 East
        Salt Lake City, Utah 84102
        (801)535-4375
        kathy@nesterlewis.com
        wendy@nesterlewis.com

**PROBATION OFFICER:**

        Glen Manross

1    July 15, 2024              Salt Lake City, Utah            10:44 a.m.

2                        P R O C E E D I N G S

3                               * * *

4         **THE COURT:** Good morning, counsel, and Mr. Sayers,

5    the Court welcomes you here this morning for this important

6    sentencing hearing.

7         Others present, the Court welcomes you as well.

8         We are here assembled to address Case

9    No. 2:21-cr-229, *United States v. Chad Leon Sayers*, who is

10   present with his attorneys, Ms. Kathryn Nester and Wendy Lewis.

11        The United States is represented by Mr. Jacob Strain

12   and Sachiko Jepson and Ruth Hackford-Peer.

13        The Court welcomes all of you, counsel, and

14   appreciates your presence on this important case, and all of

15   the input that you have given to the Court, which the Court has

16   read a number of times with great interest.

17        I want to review what I have received. I have

18   received, of course, the presentence report and sentencing

19   recommendation. The probation officer has done very thorough

20   work for the Court, Mr. Glen Manross, who I've worked with on a

21   number of very important cases.

22        I've also received the sentencing memorandum from the

23   Defendant's attorneys, which is very thorough; and also I

24   believe there's -- I had numbered them -- I believe there's 27

25   letters in support as well as kind of a summary of American

1    Express credits or disbursements, which appear to be

2    disbursements in further support of the items that Mr. Sayers

3    was promoting.  And I received from the United States also a

4    very thorough and well thought-out sentencing memorandum, which

5    refers to 18 U.S.C. § 3553(a).  I believe both of the

6    memorandums refer to the important matters outlined in that

7    statute, which the Court has also reviewed for this case.

8           I've been very interested in Mr. Sayers' background.

9    I might just make a few observations concerning that.  Well,

10   let me -- before that.  I believe counsel, both the United

11   States and Defendant, have come to a very fair, I believe,

12   recommendation, 11(c)(1)(C) recommendation to the Court

13   regarding this matter.  And I commend you, counsel, for what

14   you have -- on both sides -- come up with regarding what your

15   belief was a fair range for the Court to consider.

16          I want to just discuss a little bit about Mr. Sayers'

17   background.  It seems to me that he has just had a difficult

18   time and has raised as best he could his one child and, I

19   think, three stepchildren.  He by all accounts appears to have

20   been very devoted to them.  He had a marriage that lasted only

21   three years.  And apparently his wife -- I don't know if he

22   knows to this day where she is.  She has very difficult mental

23   problems, but he has done his best to raise the three children

24   that she had, and the one child that they had together, and has

25   acted as a mother, a father, and got them ready for school.

4

1    And I just commend him for -- I don't often see a case where

2    there's serious matters that a person is under charged, that he

3    has spent such a devoted part of his life in their -- raising

4    his family.

5            Now, on the other side, my, what a serious case.  An

6    idea that he had that appears to have been a good idea but was

7    turned into a matter that caused a loss of $10 million -- I

8    think, $250,000 for, I believe, 250 or more individuals, many

9    of whom lost almost everything, causing marital problems,

10   people that believed -- one party of the marriage believing

11   they had made a good decision in investing, and the other party

12   saying this has got to stop.  We're losing everything.  And so

13   it's just a case that's kind of torn me because of what has

14   occurred here.

15           But I think, counsel, you've made an effort, and I

16   think probably regarding what has already happened in

17   litigation in this case.  And the judgment conviction that is

18   still in effect, and I don't know, apparently there is some

19   appeal regarding that.

20           But, anyway, working with what you have presented to

21   the Court, I believe I've come up, I hope, with a sentence that

22   is appropriate.

23           But I'm going to let you make your statements to the

24   Court however you wish, and let's see if that alters what I

25   have in mind.

1          So, counsel, which ever side wants to go first.  I've

2     read your memorandums.  I think you both made, I think,

3     suggestions to the Court, and I paid close attention to those.

4     So, counsel, who wishes to go first?

5          **MR. STRAIN:**  I think we're both equal, but I'll go

6     first for convenience.

7          **THE COURT:**  All right.  Very well.

8          **MR. STRAIN:**  And, Your Honor, would Your Honor like

9     to calculate the guidelines first?  We adopt the PSR guideline

10    calculation, and I don't know if --

11         **THE COURT:**  I don't know that you have to because it

12    seems to me that they're in agreement.

13         **MR. STRAIN:**  We are, Your Honor.

14         **THE COURT:**  Yes.

15         **MR. STRAIN:**  I don't want to speak for defense --

16         **THE COURT:**  Yeah.

17         **MR. STRAIN:**  -- but I think they have agreed with the

18    Government over the guideline calculation.

19         **THE COURT:**  No, I think you -- I think both sides

20    have analyzed those very fairly and considerately.  I think

21    taking all into account that you felt was important for the

22    Court to consider.

23         **MR. STRAIN:**  Thank you, Judge.

24         And I know that Your Honor is prepared and has read

25    everything, so I won't belabor the point too long.  I just

wanted to respond to a few things that struck me in the defense sentencing memorandum.

I think one of the first things that they said is that getting to know Chad Sayers two things become apparent:

First, he loves his family more than anything; and

Second, he loves his church.

Both of those statements are exactly incorrect. He's a liar. He's a fraudster. He's divorced. He's lied to his daughter that he's stuck in a hotel. Quite the family man, and quite the churchgoer, indeed.

He's engaged in a massive fraud with no concern of how it could impact his family. The prosecution didn't do that. The Court didn't do that. There's only one person in this room who is responsible for the impact that this case will have on his family, and that is Chad Sayers. And now he's using his children as a "get out of jail free" card.

And here's the reality. Two things are apparent about Chad Sayers, and it's these two things:

He loves money more than anything; and

Second, he's addicted to the thrill of depriving other people of their money.

Defense claims that Chad Sayers is not an exceptional fraudster, and he denies basically all of the facts surrounding his fraud. He continues to claim he's innocent after a jury of his peers found him guilty. So, again, let me provide the

1  reality.

2          He has pleaded guilty to securities fraud.  He's been

3  convicted by a jury of wire fraud.  Through fraud, he obtained

4  $10 million.  And while this case was pending, he tried to

5  obtain more.  That is the very definition of what a fraudster

6  is.

7          So let me be as clear -- let me state this as clearly

8  as I possible can.  Chad Sayers lied to investors.  He deprived

9  them of an honest bargain.  He obtained large amounts of money

10  from hundreds of people, and he did this for at least a decade,

11  maybe longer.  And, yes, the *Wall Street Journal* called Utah

12  the fraud capital of the world in 2010, but that's how far back

13  this fraud goes.  It goes back to 2006.

14          Chad Sayers lied, lied, and lied, and lied some more.

15  He claims now he was repeating things that somebody else was

16  telling him in China, telling him what to say.  Okay, fine.

17  Maybe you do that one time.  Maybe you repeat what somebody

18  tells you in China twice.  Maybe you do it three times.  Twenty

19  times?  Thousands of times?  He knew -- he understood what he

20  was doing.

21          Another remarkable statement from Defense counsel's

22  sentencing filing.  Mr. Sayers wanted to develop a successful

23  product and believed probably correctly that with enough time

24  it would happen.  Really?  With enough time?  Is a decade not

25  enough time to launch a successful product?  This was a

complete and total failure.  It was a failure after failure
after failure, and he kept raising money for it.  He knew it
was a failure, and he kept doing it.

Which brings me to the most alarming thing that is in
the Defense sentencing memorandum, quote, "Mr. Sayers needs to
get back to work at whatever that may be."

This statement should terrify every person in this
courtroom because in the last decade Chad Sayers has done only
one thing, one thing, and that is deprive people of their money
and defraud people.  That has become his entire life.  And the
only way to deter him is to keep him in custody.

So we urge the Court to impose the maximum
consecutive sentence in the range for the benefit of all of the
delusional people that offered letters in support of Chad
Sayers saying that he did nothing wrong, that he had no intent
to defraud anyone.

We urge the Court to impose the maximum consecutive
sentence in the range for the benefit of Chad Sayers himself,
who took the absolute minimum responsibility possible that he
could have taken in his plea agreement just to barely cross the
threshold of the elements while denying all of the facts
surrounding his fraud.

Judge, we ask you to adopt the facts as listed in the
PSR, and impose a consecutive sentence so as to leave no doubt
in Chad Sayers' mind that his fraud, in its entirety with all

1   of its deception, has been fully exposed.

2           We urge the Court to impose the maximum consecutive

3   sentence in the range for the sake of the 300 victims in this

4   case.  And if the Court will indulge me, let me read one of the

5   very short victim impact statements from Fred Beck, which is

6   representative of the damage that Chad Sayers has done to

7   people's lives.

8           "Eight years ago I met Chad Sayers through an

9   acquaintance.  Chad asked me to fly to Boise, Idaho" -- "from

10  Boise, Idaho, to Salt Lake City paid for by me, and I had to

11  rent a rental car to drive to Sandy to meet him at his

12  headquarters.

13          "I met with Chad Sayers and some of his associates,

14  watched a video, spoke with Chad at length until I believed in

15  what he was supposedly creating.  I invested $35,000, and then

16  spent the next five years chasing my investment, which is I was

17  told a thousand excuses, and it never came to fruition.

18          "I could have invested $35,000 in my 401K or some

19  other worthwhile investment and see my money grow.  I have

20  terminal cancer and would have made other decisions in my

21  life -- when to retire, trips I would have taken -- if I had

22  not made this investment.

23          "At 68 I'm facing two to three years of my life left.

24  It would have been nice to have retired early and enjoyed

25  what's left of my few good years.  As it is, I am not finally

1    going to retire, but my quality of life is relatively poor, and

2    I don't have the money that I'd hoped to have in my last few

3    years."

4              Your Honor, this is just one of 300 stories.  This is

5    what Chad Sayers did to investors.  $10 million represents

6    financial devastation to so many people.  Through his lies Chad

7    Sayers destroyed lives.  The Court's sentence today is likely

8    the only vindication that the victims will get in this ordeal.

9    For the sake of the victims, Judge, through your sentence

10   today, let them know that you hear them.  And even though their

11   fortunes are gone, you have done everything in your power to

12   bring them justice.

13             If the Court imposes a concurrent sentence, it will

14   be virtually no punishment for this particular fraud.  If it

15   runs concurrent, he will face no additional prison time for

16   this fraud that he committed.

17             A total of 70 months incarceration for this Defendant

18   is on the generous side, in my opinion, given everything he's

19   done.  His defiant and unrepentant attitude.  But it's about

20   right for this case, and the Court can achieve this by doing

21   and imposing a 29-month consecutive sentence.

22             Does the court have any questions for me?

23             **THE COURT:**  I have no questions.  Thank you very

24   much, sir.

25             **MR. STRAIN:**  Thank you.

1          **THE COURT:**  All right.  The Defense may make a

2   statement.

3          **MS. LEWIS:**  Well, Your Honor, I think that there's

4   some things that we strongly disagree with the Government on.

5          I think to make a statement that Mr. Sayers does not

6   love his family and is not a God-fearing man borders on cruel,

7   actually, because that's just not true.  No matter what else

8   happened, or what anyone else believes in this courtroom, his

9   family has always come first.

10         When Mr. Sayers contacted me about representation,

11  our first phone call was not about this case.  It was about his

12  family and what this was doing to his -- particularly his

13  daughter that is talked about in the sentencing memo.

14         But moving on from that, this case is very, very

15  different than what we typically see in "fraud" cases in this

16  district.  Utah has been known for a long time of having a high

17  rate of fraud, and most of those cases that we've seen have

18  talked about pyramid schemes, Ponzi schemes.

19         This was a case where Mr. Sayers had an idea, and it

20  was a good idea.  It was a smart idea.  He came up with a

21  videophone at a time before Apple had, at a time before any of

22  us were seeing videophones.  He had numerous people on board.

23  He had a CFO.  He had employees.  He had manufacturers in

24  China.

25         I said there was two things that you know right away

meeting Chad Sayers:  About his love of family, and his love of

God.  There's a third thing.  He's an eternal optimist.  I have

to say that he's an optimist to a fault.  He believed with all

of his heart that this was going to work out, that he was going

to develop this product.

He wanted the Court to see -- and I brought just --

he did a number of prototypes, and these were some of the

things, the phones that he was developing.

This is full of phones that -- Saygus Phones.  Now,

yes, they're prototypes.  Yes, they never got to the point

where, you know, they were distributed to his investors.

That's true.  But this was not a case where he was collecting

money so he could just live an extravagant life without trying

to develop a product and without doing what he was saying he

was going to do.  He was making every attempt to do what he was

saying he was going to do.  I mean, there's numerous attempts

at phones and things that he was working here, and there's

another box here that was brought of technology that was being

developed with manufacturers in China.

Chad Sayers does take responsibility for the amounts

of money that was lost.  He made it very clear that he was not

going to fight restitution in this case.  He said, "I don't

want to have a restitution hearing.  People lost money because

of me, and I know that.  They trusted me.  They trusted this

product, and it didn't work.  And I want to pay those people

1  back."

2       Now, will he ever be able to pay back that money?

3  You know, I don't know that he will.  I mean, it's a lot of

4  money.  And the Government states their concerns, "Well, if you

5  let him out, he'll start a new business."  Well, a couple of

6  things with that.

7       One, he is being punished for both of these cases

8  even if the sentence in this case runs concurrent.  He'll have

9  two felony convictions.  The other one, the first one is on

10  appeal.  That's true.  He denies that conduct.  He hopes to see

11  that reversed.

12       I think we all know, and I was very clear with Chad

13  and clear in my memo the chances of that happening is very,

14  very slim.  That's just not how things work when cases go up to

15  the Tenth Circuit.  It's very rare that a jury verdict is

16  reversed.  But either way, let's say even if it is, he's going

17  to have a felony.  If he tries to start another business, we

18  can all bet and believe that he will be watched very, very,

19  very closely.

20       He has spoken many times about the lessons learned in

21  this business.  The things that he did wrong.  The things that

22  he would do different.  I don't know if he'll be able to start

23  another business, but he certainly will be able to work.  He is

24  a bright man.  He did just turn 60 years old, but that -- I can

25  say myself now, I sure hope that means there's a lot of years

1   left that he can work.  And you, yourself, would know that.  He

2   has a lot of years that he could work and begin to pay people

3   back, because he wants to pay these people back.  He really,

4   really truly does.

5         He lost a lot of money in this investment in trying

6   to develop this product.  Yes, he was optimistic over and over

7   and over.  And he was told by manufacturers in China, "It's

8   ready.  It's going to be ready."

9         Did he keep doing it more than once?  Yes, he did.

10  And I think it's not because he's a fraudster; it's because

11  it's his personality.  Every single time, even though he

12  shouldn't have, he believed them.  "This time it's working.

13  This time it's almost ready."

14        He was excited, and he would tell investors, "It's

15  coming.  It's almost ready.  The product's coming."

16        There were times that he actually gave money back to

17  investors.  There was an Indiegogo campaign, and        Mr.

18  Sayers tells me this, where they raised $1.3 million.  I don't

19  know if you're familiar with how Indiegogo works, but you

20  pledge so much, and in the end you get the product.  Well, the

21  product wasn't ready at the end.  Because as we know now, the

22  product never was completely ready.  That money was all

23  returned to those investors.

24        He had a company in California that was raising money

25  for him.  When he discovered that company was in legal trouble,

1    he spoke with attorneys, and they agreed and told him, "You

2    need to return the money that that company raised for you."  It

3    was another $600,000, give or take, he returned.  He was trying

4    to do things the right way.

5         He absolutely made mistakes.  What he's admitted to

6    is telling investors -- not telling investors, new investors,

7    that he was being sued by other investors when they were giving

8    him money.  Initially, he didn't know that that was a problem,

9    but he learned that was a problem.  And he has taken

10   responsibility for that, and he's taken responsibility for

11   losing these people's funds.

12        One thing I'll say, though, is when the people

13   donated the money, there wasn't a product.  They knew there

14   wasn't a product yet.  They knew that the money was going to be

15   somewhere down the line.

16        You take a risk when you invest.  And I know the

17   Government says that it shouldn't have been a risk because he

18   was admitting fraud.  We disagree.  We do think that he did do

19   something that was illegal, which is why he plead guilty and is

20   accepting responsibility for that.  But this was not something

21   where he went into it saying, "I'm going to make up a company.

22   I'm going to make up an idea.  I'm going to take these people's

23   money, and then I'm going to go and live the good life."

24   That's not what happened.

25        I know the Government has talked about the American

Express charges, which Tim Williams, who is the CFO, who I spoken to who also wrote the letter explained Chad never even had an American Express card. Those were for business expenses. Any money that was given to him as salary or to pay for rent was reported on W-2s. They were trying to do the right thing.

I don't think it's fair to say that everyone who wrote a letter in support of him is delusional. He has a lot of support and a lot of people who believe in him. And to state, "Oh, they're all delusional." That's not a fair statement to make.

This man has led 60 years of life. He's raised a family. He wanted the Court to know also in terms of the children and stepchildren that he's raised, he raised three of his nephews who were doing poorly and were involved in gang activity. By the time they came and lived with Chad and got through high school, they were accepted into ivy league colleges. They're successful men in their 30s now. I believe that was mentioned in a couple of the letters.

Chad Sayers is a good man who -- who has some difficulties with his view of the world, quite frankly, difficulties that did lead to people losing money. But it wasn't because he wanted to hurt people. It was because he just believed too big and too much, and thought he could do things that he just ended up not being able to do.

1          Additional time in custody is not going to do

2    anything to fulfill the -- what the fulfillments that we look

3    at 18 U.S.C. § 3553(a).  What do we want to do?  Do we want to

4    put him in where he just adjusts to being in custody?  Where

5    he's happy being in custody?  You do that, someone gets out of

6    prison, and they're more likely to commit another crime because

7    going to prison isn't a big deal.  We see people in and out, in

8    and out.  They get institutionalized.  We don't want to see

9    that happen to Mr. Sayers.  We want him to get out and not

10   ever, ever, ever want to go back, which is where he is right

11   now.

12         He has -- this has been so difficult for him, and as

13   it would be for anyone in his position.  But 60 years old, and

14   he's never committed a crime before.  I know the Government

15   would disagree with that, saying this fraud went back years and

16   years and years.  Well, agree to disagree that that's where

17   this started.  It ended up in a place where it shouldn't have

18   ended up, and people were hurt.  We accept that.  He accepts

19   that.

20         But we would have that the Court sentence him to a

21   concurrent sentence to the time he's serving in his other case.

22   That -- give him an opportunity to start paying back the people

23   that lost money by believing in him.  I think that would

24   fulfill the requirements of the statute.  I think that that is

25   a severe punishment for Mr. Sayers.

1          Of course, if his other case gets overturned, he

2     would have to finish the sentence in this case.  It's not like

3     he would do additional time.  And if that case gets overturned,

4     then it's proper that his sentence be shortened.  It is.

5          I know he has a couple of things he would like to

6     say.  I don't know if you have any questions for me.  I think I

7     covered everything.

8          **THE COURT:**  Yes.  Let me -- there's a couple of

9     things that disturbed me -- not a couple, quite a few,

10    actually.  He rented a very large building around the point of

11    the mountain, as I gathered, from reading, that had a lot of

12    space, and there were only, I think at that time ten employees.

13         Now, what was that -- why was that big building

14    rented for, other than to try to show people that this was

15    going to be a tremendous success?  When at the time it appeared

16    that there was no chance of it being a great success.  Do you

17    have a response that?

18         **MS. LEWIS:**  I might let Mr. Sayers respond to that,

19    but my response to that would be at no time did he think this

20    was not going to be a tremendous success.

21         **THE COURT:**  Well, he might have thought that, but

22    when you have a building that big with ten employees, it seems

23    to me that it's quite obvious for anyone who goes into the

24    building that there's something wrong here.

25         **MS. LEWIS:**  I think in hindsight that's true.  He

19

1    believed, though, that they were a growing business, and that

2    this space was needed, and this was going to be a tremendous

3    success.  And like I said, I can let him address that, but

4    renting a building, yes, to make it look like it's a success, I

5    guess, is one way to look at it.  But again, it's putting money

6    not into his pocket.  It's putting money into the business.

7         I do think Chad did tend to run ahead of himself.  He

8    tended to jump to the end, to the success, quicker than he

9    should have.  The mistakes that he made, in our view, were not

10   because he was trying to defraud people, but were just bad

11   business decisions based on someone who really thought he was

12   going to get where he was going.

13        **THE COURT:**  All right.

14        Let me -- there's another question that I want to

15   probe you on.  You know, I've lived a long time, as you stated.

16   I think you stated that.

17        **MS. LEWIS:**  Not quite in those words, I don't think.

18        **THE COURT:**  And that's true.  And in my career on the

19   federal and state bench, which is over 50 years --

20        **MS. LEWIS:**  Yes.

21        **THE COURT:**  -- about 50 years, I've seen a lot of

22   fraud cases.  And I haven't -- almost without exception, those

23   fraud cases have been filled with high-stakes living, either

24   gambling, big homes, a lot of cars, and just going for

25   high-and-mighty living.  I haven't seen this, I don't think --

1    something was mentioned about that, I think a BMW or something.

2    What -- what assets did he have --

3            **MS. LEWIS:**  He didn't.

4            **THE COURT:**  -- that he used these investors money

5    for?

6            **MS. LEWIS:**  The money was going into the attempts to

7    manufacture these phones.  The building.  He did buy the

8    building.  My understanding is he -- there was -- the

9    Government has brought up the -- he put some money in his high

10   school football field that he played on as a young man.

11           Is that correct?

12           **THE DEFENDANT:**  It had nothing to do with investors'

13   money.  That was $3.5 million that I had from a judgment that I

14   had from 2008 for real estate that I owned in Park City.  I

15   borrowed $3.5 million against it.  And the Prosecution has

16   asked about that before.  It had nothing to do with investors'

17   money, Your Honor.  I would never do that.

18           **MS. LEWIS:**  All right.

19           But he was not -- the money was going into trying to

20   develop these products.  He was renting a home.  He had an old

21   car.  He wasn't -- it is different.  It's one reason we've come

22   to this resolution in this case is because that is what we

23   typically see, and that is not what was happening in this case,

24   so you are correct about that.

25           **THE COURT:**  All right.  Very well.  Thank you very

1  much, Counsel.  I'd like -- if he wishes to make a statement,

2  and then I'll let --

3          **MR. STRAIN:**  Your Honor, may I speak with Ms. Lewis

4  before --

5          **THE COURT:**  Yes, you may.  Yes, you may.

6    (*A sotto voce discussion was held between all attorneys*.)

7          **MS. LEWIS:**  Could we have one moment?

8          **THE COURT:**  Yes, you may have a moment, counsel.

9    (*A sotto voce discussion was held between all attorneys*.)

10         **MS. LEWIS:**  Could we have one moment.

11         **THE COURT:**  Yes, you may.

12         **MR. STRAIN:**  The white -- Judge, the white noise is

13  probably --

14         **THE COURT:**  Okay.

15                 (*Sotto voce discussion was held*

16            *between Defense counsel and Defendant.*)

17         **MS. LEWIS:**  Your Honor, I'm sorry, I need to make a

18  correction.

19         **THE COURT:**  Go ahead.

20         **MS. LEWIS:**  Something was just brought to my

21  attention.  Apparently, last week the Federal Defenders' Office

22  decided they are not filing a direct appeal of his case that he

23  lost with Judge Nielson.  They, apparently -- and I guess this

24  email went to the U.S. Attorney's Office, but they neglected to

25  copy Kathy and myself on it, so I was unaware that he was not

1    filing an appeal any longer.  They've advised him, instead, to

2    file a 2255, that his issue was primarily an "ineffective

3    assistance of counsel" issue.

4         I do think -- so I want the Court to know that that's

5    a mistake, that that matter is not going up on appeal.

6    However, I would say from our position that makes a concurrent

7    sentence make more sense not less, because he's going to be

8    serving 41 months.  It will take -- he has up to a year, I

9    guess, to file an "ineffective assistance of counsel."  Even if

10   he were to win that, I think his sentence in that case will be

11   complete before any decision is ever made on that, and of

12   course, I think we all know those are pretty difficult to win.

13   But that needed to be clarified.  I was not aware of that until

14   right now.

15        **THE COURT:**  Okay.  All right.  Well, the Court will

16   give that some thought, okay?

17        **MS. LEWIS:**  Thank you.

18        **THE COURT:**  Mr. Sayers, if you wish to address the

19   Court, you may do so as well.  And if you want to remain at

20   counsel table, or if you want to come to the lectern, you may

21   choose whichever place you want to address the Court.

22        **THE DEFENDANT:**  I think probably the lectern so you

23   can hear me better.

24        **THE COURT:**  All right.  Very well.

25        **THE DEFENDANT:**  Your Honor, first of all, thank you

1    for your years of service on the bench and for all the things

2    you do for America and the state.

3           As I've gone through this process, it's been very

4    difficult, you know, knowing that I did not commit what I'm in

5    jail for, but I have to work on the appeal process.  That's

6    America.  That's how it works, and sometimes we take a hit.

7           I want to say -- express my gratitude, in spite of

8    what Mr. Strain said today.  I know his job is to defend the

9    federal government and the people who have been injured under

10   any circumstance.

11          But I am very grateful.  In the very beginning, about

12   three years ago, they were willing to drop off good men and

13   women who served as my executives from an indictment, and I

14   said, "Focus on me.  I'm the start-up guy.  I'm the one who

15   started the company.  I'm the one who is the inventor.  Please

16   come after me."  And I have to give that honor to

17   Ms. Hackford-Peer.  I believe she was the one who was willing

18   to do that.

19          In addition to that, I'm very grateful that six weeks

20   ago she was willing to send out to the 250 shareholders or so

21   that they have, access to a request for me to have a

22   misdemeanor.  There isn't a misdemeanor for my particular

23   thing.  It's for registered brokers, not for unregistered

24   securities.  I just -- that is huge to me, because that makes

25   me recognize that they can see we're doing our very best, at

**24**

1    least at some level.

2            As far as the comments from the prosecutor, today

3    he's absolutely incorrect.  He stated at my last trial that I

4    am a liar, cheat, and manipulator, and a thief.  That's just

5    not true.

6            I don't know how you can be -- represent the U.S.

7    government, sir, and say things when you don't have the full

8    story from a trial.  That was the first day.  That's unfair,

9    because those jurors are listening.  I trust the federal

10   government, and I trust the prosecutors.  In fact, they're

11   defending me as the majority shareholder of my own company by

12   prosecuting me.  And I'm grateful that they're just trying to

13   do their job.

14           My daughter is nine years old.  When she spoke on the

15   phone and said, "Daddy are you in prison?"  What was I supposed

16   to tell her?  She's got kids at school around her.

17           I said, "Honey, I am not."  Because I'm not in

18   prison.  I'm in a jail.  I did not lie to her.  I told her,

19   "I'm stuck in a place like a hotel."  That is true.  I said

20   that for a nine-year-old.

21           And she's traumatized that I'm not there.  She's

22   traumatized that -- she hasn't seen her mother but once in four

23   months because her mom struggles with mental health issues that

24   I had no idea she was going to have.  With depression and PTSD

25   from being beaten that severely throughout her life from the

1   one guy she dated all the way back from grade school, and so I

2   tried to be easy on that.

3          As far as the shareholders are concerned, let me make

4   something very clear to this Court, and this room, and this

5   world right now.  And if it goes out all over the world, let me

6   make this clear:  These are good people who invested in me.

7   They trusted me.  Every Penny that they gave us was hard earned

8   by someone, and that money matters.  It's a dollar is a dollar,

9   and you earn it.

10         My uncles taught me you work hard.  At the age of 12

11  I was in there working construction through the summers with

12  them, and they treated me like I was 18 years old.  This money

13  is no trifle matter.  These people need to have their money

14  represented well.

15         And we -- I'm an inventor.  I turned into an

16  entrepreneur from that invention, and I believe that what I was

17  doing was bringing a product to market.  In fact, we put five

18  products that we built and designed that we began to patent

19  that the world has never seen.  Two smartphones that both won

20  the best phone in the world.  It's argued by some people that

21  our 2015 smart phone is still the most advanced smartphone ever

22  made because four of its technologies have never been

23  integrated into smartphones yet.  I mean, amazing technologies

24  like a military-grade antenna.  A chip that gives you

25  50 percent off your battery life, and a couple of other things

1    that are outstanding.

2        The radio-calling technology, which is something you

3    may have used with your grandkids, no one had ever done that.

4    It's cellular-video technology.  And it wasn't done before.

5    Verizon took us on a tour with them.  We signed a contract with

6    them for three years.  When you have a contract with Verizon,

7    they're the hardest lab in the world to get to, and we were the

8    first ones approved through their new lab.  We had a lot of

9    great things going on, that's true.

10        How we have retained five securities firms and not

11    one of them told us that we needed to disclose shareholder

12    lawsuits when we were getting loans from banks for hundreds of

13    thousands of dollars in the essence we had lawsuits.  We said,

14    "Yes.  We have two shareholder lawsuits."

15        They said, "We don't care about those.  Anything

16    else?"  And yet still securities attorneys didn't tell us.

17    Two, one from Jones Waldo, one is Clyde Snow.  These were top

18    people that should know their job.  But that's my fault because

19    I'm the person who picked those firms.  I understand that those

20    funds were lost, and these people, and I don't know -- I know

21    most of these shareholders.  I don't know them because they

22    came from an investment group that raised money for us, but

23    those people put in their documents, I don't know about all of

24    them, but most of the ones I saw, and it had to be more than

25    eight -- 95 percent of them stated that they were accredited

1    investors.

2        Now, maybe they jumped to that conclusion.  Maybe

3    they shouldn't have put that on there, but that's why the

4    Government has changed it's on the onerous of the company to

5    make sure they're accredited.  It's a new law since the Jobs

6    Act of like 2015 or '16.

7        As far as the state --

8        **THE COURT:**  I think you now should speak through your

9    attorneys.

10        **THE DEFENDANT:**  Okay.

11        **THE COURT:**  I've evaluated a lot of what has been

12    presented.  I want you to make a statement on your behalf or

13    whatever, but I think maybe I've heard enough.

14        **THE DEFENDANT:**  Okay.

15        **THE COURT:**  Anything further from counsel?

16            (*Sotto voce conversation between*

17            *Defense counsel and Defendant.*

18        **MS. NESTER:**  Your Honor, the only thing, I guess, we

19    would like him to wind up, if you'll allow him, is just to -- I

20    think at the end he was prepared to apologize, and I do want

21    him to get to that.  So if we could get him to fast forward

22    through all the facts, and just get straight to the apology.

23        **THE COURT:**  You don't need to go through all the

24    facts of the case.

25        **MS. NESTER:**  Thank you, Your Honor.

1          **THE COURT:**  I certainly tried to evaluate those, but

2   he may make conclusory comments.

3          **MS. NESTER:**  Thank you, Your Honor.

4          **THE DEFENDANT:**  Yes.  Thank you, Your Honor.

5          In our best effort, we did our very best.  I only

6   made $4,400 a month.  These people, they lost their hard-earned

7   money.  And that is it doesn't matter if it's my dying breath,

8   I will make sure that I find a way to get those people paid

9   back.  And it --

10         Of course, I offer my most sincere apologies in

11  anything that we didn't do correctly.  But I'm the guy who ran

12  the company, and I'm the one responsible.

13         **THE COURT:**  I don't want to discourage you on being

14  optimistic.  I think that's a good quality.  But I must say to

15  you that in all my years in handling these cases, I don't think

16  I've seen one case where those who lost money were made whole.

17  And so I think that's a big step for you to take, but not one

18  that you should lose your desire to want to do.  And I commend

19  you for that.  Okay?

20         **MS. NESTER:**  Thank you, Your Honor.

21         **MS. LEWIS:**  Thank you, Judge.

22         **THE COURT:**  Thank you very much.

23         All right, counsel, I don't think if there's anything

24  further that you want to say, but I don't think we need to go

25  back and forth on this.  I think I've heard everything that has

1    been submitted.  And I think both sides have made, I think,

2    very fair evaluation of the case, and I appreciate that.  And

3    so I'm going to ask you, counsel, if there's any reason why

4    sentence should not now be pronounced?

5         **MR. STRAIN:**  No, Your Honor.

6         **MS. NESTER:**  No, Your Honor.

7         **THE COURT:**  I want to take a few minutes, again, off

8    the bench, and I want my probation officer to come with me for

9    just a final conference in the jury room.

10         (Recess taken from 11:31 a.m. to 11:35 a.m.)

11         **THE COURT:**  All right, counsel, again.  I thank you;

12    and Mr. Sayers, I thank you for your comments as well.

13         I'm going to make some findings before imposing

14    sentence in this matter.

15         The total offense level in this case is a Level 25.

16    Criminal history is a Category II.  The guideline range is 60

17    months.  The plea agreement is for 19 -- a range of 19 to 29

18    months, which is in accord with Rule 11(c)(1)(C) of the Federal

19    Rules of Criminal Procedure.

20         And I have, of course, considered the sentencing

21    memorandums that each of you have filed.  I think those

22    memorandums are very well written and reasoned.

23         The supervised release is one to three years.  The

24    agreement is 12 months consecutive to Case No. 2:22-cr-480.

25         **MR. STRAIN:**  Your Honor, that's concurrent.

1              THE COURT:  Pardon me?

2              MR. STRAIN:  The supervised release term we've agreed

3    is concurrent.

4              THE COURT:  It's concurrent to?  That's the

5    agreement?

6              MR. STRAIN:  That's correct, Your Honor.

7              THE COURT:  It's concurrent to that and not

8    consecutive?

9              MR. STRAIN:  Correct.

10             THE COURT:  All right.  Very well.  That correction

11   is to be made.

12             The fine range is $10,000.  The restitution is

13   $10,000 -- or $10,250,834.53.  The special assessment is $100

14   for the count to which a plea is entered.  There is a

15   forfeiture of a money judgment in the amount of $10 million.

16   The Court has considered 10 U.S.C. § 3553(a) factors, and

17   applied those factors to the facts of this case.

18             There being no legal reason now why sentence should

19   not be entered, it is the judgment of the Court that the

20   Defendant, Chad Leon Sayers, is placed in the custody of the

21   Federal Bureau of Prisons for a period of 29 months, 15 months

22   of which is to run consecutive, and 15 -- or 14 months to run

23   concurrent.

24             Upon release from confinement, the Defendant shall be

25   placed on supervised release for a term of one year.

1          Within 72 hours of release from custody from the

2    Federal Bureau of Prisons, the Defendant shall report in person

3    to the probation office in the district to which the Defendant

4    is released.

5          In accordance with the Violent Crime Control and Law

6    Enforcement Act of 1994, the Court finds that the Defendant

7    poses a low risk of future substance abuse; therefore, the

8    Court suspends the requirements that the Defendant submit to

9    mandatory drug testing.

10          The Court orders that pursuant to 42 U.S.C. § 14135a

11    and 10 U.S.C. § 1565 as authorized in Section three of the DNA

12    Analysis Backlog Elimination Act of 2000, and the Section 203

13    of the Justice For All Act of 2004, the Defendant shall submit

14    to the collection of a DNA sample at the direction of the

15    Federal Bureau of Prisons or U.S. Probation Office.

16          The Court grants the Government's motion, and orders

17    the forfeiture of the following items:  Money judgment in the

18    amount of $10 million.

19          The Defendant shall not commit any federal, state, or

20    local crime, and as a convicted felon shall be prohibited from

21    possessing a firearm or ammunition.

22          In addition, the Defendant shall not illegally

23    possess a controlled substance.

24          Now, counsel for Mr. Sayers, I'm going to address you

25    now.  Have you discussed with him the mandatory and standard

conditions of supervision and reviewed those revisions or

conditions with him?

              **MS. LEWIS:**  Yes, we have, Your Honor.

              **THE COURT:**  And if he had any question regarding any

of those matters, were his questions answered to the best of

your knowledge to his satisfaction?

              **MS. LEWIS:**  Yes.

              **THE COURT:**  Is that correct, Mr. Sayers?

              **THE DEFENDANT:**  It is.

              **THE COURT:**  All right.  Very well.

              The Defendant shall also comply with the following

special conditions:

              1.  You must inform any employer or prospective

employer of the current conviction and supervision status.

              2.  You must not be involved in any fiduciary

capacity or any position allowing access to credit or personal

information of others unless the third party is fully aware of

the offense of your conviction and the U.S. Probation Office

approves.

              3.  You must not enter into any self-employment while

under supervision without prior approval of the U.S. Probation

Office.

              4.  You must provide the U.S. Probation Office

complete access to all business and personal financial

information.

5.  You must not create a DBA or LLC without prior approval of the U.S. Probation Office.  You must also disclose to the U.S. Probation Office your involvement in exiting DBAs or LLCs.

6.  You must refrain from incurring new credit charges or opening additional lines of credit unless in compliance with any established payment schedule and obtained the approval of the U.S. Probation Office.

7.  You must not transfer, sell, give away or otherwise convey any asset with a value of $500 or more without the approval of the U.S. Probation Office.

8.  You must apply all monies received from income tax refunds, lottery winnings, judgments, and/or anticipated or unexpected financial gains to the outstanding court ordered financial obligations.  You must immediately notify the probation officer of the receipt of any indicated monies.

9.  You must notify the U.S. Probation Office within 72 hours of acquiring or changing any type of communications device, including cellular telephones, personal telephones, business telephones, electronic mail address or web address.

10.  You must be placed on the State Finder and Treasury Offset Programs requiring any state and federal tax refunds be intercepted for purposes of court-ordered financial obligations.

11.  You must notify the U.S. Probation Office and

the office of the United States Attorney of any material change

in your economic circumstances that might affect your ability

to pay court-ordered financial obligations.  You must also

notify the U.S. Probation Office and the office of the United

States Attorney of any loss of employment or increase or

decrease in income.

12.  You must submit your person, property, house,

residence, office, vehicle, papers, computers as defined in

18 U.S.C. § 1030(e)(1), other electronic communications or data

storage devices or media to a search conducted by the U.S.

Probation Office at a reasonable time and in a reasonable

manner based upon reasonable suspicion of contraband or

evidence of a violation of a condition of release.

Failure to submit to a search may be grounds for

revocation.  You must warn any other residents that the

premises may be subject to searches pursuant to this condition.

Pursuant to 18 U.S.C. § 3664(f)(2), the Court has

considered Defendant's financial resources and other assets,

projected earnings, and other income, and any financial

obligations when considering the Defendant's payment schedule

for fines and restitution.  The Court finds the Defendant does

not have the ability to pay the fine, and hereby waives the

fine pursuant to 18 U.S.C. § 3572 and USSG Section 5E1.2(a).

The Court finds that restitution ordered pursuant to

18 U.S.C. § 3663(a), the restitution of $10,250,834.53 is

1    payable in the amounts listed in the attached spreadsheet

2    through 250 victims.

3          The Court shall -- the Defendant shall pay the

4    greater of $25 per quarter or 50 percent of choice -- of

5    "choose an item of income" while incarcerated.

6          If the Defendant receives more than $200 from any

7    outside source in any given month during the period of

8    incarceration, all funds received in excess of $200 that month

9    shall be paid towards restitution.

10          The Defendant shall pay restitution at a minimum rate

11    of $300 per month upon release from incarceration.  The Court

12    waives the accrual of interest.

13          It is ordered that the Defendant pay the special

14    assessment fee in the amount of $100, which shall be payable

15    and -- which shall be due and payable immediately.

16          There are some counts, I believe, to be dismissed.

17          Counsel for the United States, do you want to

18    identify those counts?

19          **MR. STRAIN:**  Yes, Your Honor.  Those are Counts 1, 2,

20    and then 4-6.

21          **THE COURT:**  The Court orders Counts 1, 2, 4, 5

22    through 6 dismissed.

23          Counsel, do you want the Court to make any

24    recommendation to the Bureau of Prisons?  I'm willing to do so

25    if you have any recommendations.

1          **MS. NESTER:**  Just one moment, Your Honor.

2          **THE COURT:**  Yes.

3              *(Sotto voce discussion was held between*

4                  *Defense attorneys and Defendant.)*

5          **MS. LEWIS:**  Yes, Your Honor.  We would ask that -- a

6     recommendation be made that he serve his sentence at camp at

7     Tucson for purposes of family visitation.

8          **THE COURT:**  All right.  I will recommend to the

9     Bureau of Prisons that he be allowed to serve his sentence at

10    FCI Tucson, Arizona.  I want him to know, Mr. Sayers, that this

11    is a recommendation only, that the Bureau of Prisons makes

12    their decisions based on their strictures.  However, they try

13    to follow the sentencing judge's recommendation in so far as

14    possible.

15         All right.  Any other recommendation, counsel?

16         **MS. LEWIS:**  No, Your Honor.

17         **THE COURT:**  All right.

18         I'm going to add, Mr. Sayers has been very -- it

19    indicates by what I have read, very interested in furthering

20    his education.  Apparently, he's attended several universities.

21    If there are any educational opportunities at the FCI where he

22    is housed, I will recommend that he be allowed to participate

23    in those opportunities, and that he be allowed to participate

24    in any vocational, educational programs that may be available.

25         He has, apparently, an excellent record as far as any

1    problems with drug abuse, so there's no need for any other

2    recommendation regarding drugs or alcohol or anything of that

3    nature.

4          So, Mr. Sayers, the Court wishes you well.  As I

5    stated, I was impressed with how devoted you were to your

6    family, to your children, to your stepchildren in the wake of

7    terrible problems that they were experiencing, and one of your

8    stepchildren, Bian -- I hope I'm pronouncing that right.

9          **THE DEFENDANT:**  Bian. ^^

10         **THE COURT:**  I think he paid great tribute to you for

11   all that you tried to do for the stepchildren and for their

12   mother, who was having serious problems, and apparently her

13   location is unknown at this time.  So I commend you for that.

14         And, again, I -- I wish you well.  There's hope.

15         **THE DEFENDANT:**  Thank you, Judge.

16         **THE COURT:**  No matter what consequences we are faced

17   with in this life, never give up hope and rise again.  If you

18   can do that, I will be very, very pleased.  Do you understand?

19         **THE DEFENDANT:**  I do, Your Honor.

20         **THE COURT:**  All right.  Very well.  I'll remand you

21   to the United States Marshals to carry out the sentence

22   imposed.

23         Marshals, thank you very much for your great service.

24         I hope I mentioned to you that not too long ago three

25   of you lost your lives in trying to carry out your assignment,

1    so I know you put your lives on the line for the great

2    institution of the judiciary which you defend, and we

3    appreciate that very much, and also the assignments that you

4    are asked to carry out, which I know are very dangerous.  So,

5    marshals, thank you for your great service, and court security

6    as well.

7            Counsel, thank you on both sides for your expertise

8    and for your assistance to the Court on a very important

9    matter, and thank you all very much for your help.

10           We'll be in recess on this important matter.

11           And U.S. Probation, my great probation officer, what

12    a great assist you have been to the Court over the years.

13    Thank you all very much.

14           And to those that lost money in this -- in this

15    affair, I wish there was some way that there can be a recouping

16    of that and you be made whole from this experience.

17           All right.  With that, we'll be in recess.  Thank you

18    very much.

19           (The hearing was adjourned at 11:52 a.m.)

20

21

22

23

24

25

C E R T I F I C A T E

STATE OF UTAH          )
                       )
                       )   ss.
                       )
COUNTY OF SALT LAKE )


     This is to certify that the proceedings in the foregoing matter were reported by me, Michelle Gonsalves, RPR, CRR, CBC, CSR, in stenotype and thereafter transcribed into written form;

     That said proceedings were taken at the time and place herein named;

     I further certify that I am not of kin or otherwise associated with any of the parties of said cause of action and that I am not interested in the event thereof.

     In witness whereof I have subscribed my name this 16th day of June 2025.




*Michelle Gonsalves*
_____

Michelle Gonsalves, RPR, CRR, CBC, CSR